In your honors, may it please the court, Jonathan Cederbaum for the Attorney General of Delaware. With the court's permission, I reserve three minutes for rebuttal. Okay. In Citizens United, the Supreme Court reiterated that, quote, the public has an interest in knowing who is funding speech about a candidate shortly before an election. If voters know who is funding election-related- I should have asked this before your time started. Is there an urgency here that, I assume Delaware's election is November 34th, I don't know, but are we confronted with a situation here where there's some need to urgently decide whether or not the injunction stays or the injunction is going to be lifted? And maybe I should ask- well, I should ask you, I guess, on both sides. From your position, is there an urgency in ruling? Well, your honor, I am not sure. I'd like to confer quickly with the Election Commission's office. Okay, and actually, it might be a good question, because they are the ones who might want to get the voter guide out. Well, no, they can get it out. They are already protected by the preliminary injunction. You're right. Would you really stop this clockwise and give them a few minutes? I think, you know, as was indicated below- Yeah. No? Okay. As was indicated below, though, you know, when the parties discussed the schedule and how the case should be resolved below, you know, the state has an interest in clarification of law in this area. Okay. As I was saying, though, if voters know who is funding election-related communications, the court explained in Citizens United, they can better evaluate those messages and make more informed choices on Election Day. Delaware's Disclosure Act directly advances those important public interests. The state legislature- I'm sorry, why in pursuing those interests do you need up to four years of information about contributors? Isn't the state's interest much greater for those who are speaking about election-related activities closer to the election? Why all the way four years back? And has any look-back period that long been upheld? A couple of responses, Your Honor. First, as we indicated in our reply brief, BSF waived that argument by not raising it below. They didn't mention it, and the district court did not address it. In fact, of course, the only distinctions to which the district court looked had to do with the scope of the speech covered by the Act. Of course, I'd be happy to address the merits of the point. I think that there are a couple of considerations that support that kind of election period definition. The idea that the legislature had in mind, and this is reflected in the definition, is that they should capture the relevant period when campaigning may be going on. The way it's defined in the statute is two-fold. If you're an incumbent, it covers your term in office, which for some offices may reach that far back, though not for all. It will just depend on the term of office. And for challengers, it's triggered by when the first contribution is made, which also indicates when electioneering will be going on. With respect to why it is reasonable to cover that period, the full period when electioneering may be going on, I think there are two considerations that are important. One is that money is fungible, and so even money given some time ago may help organizations, like DSF or others, when they ultimately get to the point of making communications closer to the election. Second is that individuals and organizations that contribute money to organizations, I think can be reasonably expected to know the causes that those organizations are advancing. And so it should come as no surprise that if you give a contribution to an organization like DSF, even three years ago, that money may well be used to advance DSF's message. And therefore, it will be important to the electorate to know that if, in fact, that money did help fund and support the election-related communication that is made much closer to the event, who is behind the funding. And so I think it contributes very directly to letting the public know who is, in fact, providing the backing for what becomes the election-related communication. And what about the earmarking? I should say, Your Honor, also, as we noted in our brief, Maryland has a similar reachback period, though it has not been tested in court yet. Even if the absence of an earmarking restriction wouldn't invalidate the statute, should we take account of its absence here in determining whether the exacting scrutiny standard has been satisfied, whether there's a substantial relationship? Right. Well, again, Your Honor, I think that statutes without earmarking requirements have been repeatedly upheld, including by the Supreme Court. The McConnell case, of course, the McConnell decision upholding the BICRA provision, was, first of all, BICRA itself has no earmarking requirement, and the McConnell decision occurred before a regulation had even been proposed. Where is the case challenging that regulation now? The case challenging that regulation is on remand in front of the district court. The district court throughout the regulation, it went up to the D.C. Circuit, and the D.C. Circuit sent it back for a revision in the Chevron analysis, and the district court has not ruled after the remand. But again, I think the key thing with the issue of earmarking, in a sense, as with the election period, is that, again, money is fungible, and when you give to a group, you can anticipate that your money, if you're giving it on an unrestricted basis, may well be used for any purpose, including the purpose, ultimately, of election-related speech. The D.C. Circuit made that very point in the SpeechNow.org case, which was a decision by Judge Sentell, in which he noted that the public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made toward administrative expenses or independent expenditures. So I don't mean to suggest that it's not a consideration that you may weigh, among other characteristics, but I think the other courts have suggested, and the Supreme Court has suggested, that there are reasons why leaving out an earmarking requirement does not undermine the important interests here, or add in a substantial way to the burdens that may be involved. So one of the things that the district court talked about was that, in its view, the voter guide fell outside of the express advocacy, issue advocacy dichotomy, and that that was sort of part of the rationale for coming up with the neutral communications. What's your view on where that falls? I presume, from your perspective, it obviously falls smack within it. I mean, she defines advocacy as a communication that is intended to affect voters' choices at the ballot box. Well, Your Honor, in terms of the test about express advocacy or its functional equivalent, of course the Supreme Court has held that there is no need for disclosure laws like the Disclosure Act to be limited to such communications. So it's not necessary to determine whether this particular voter guide qualifies under that test. It's fine for it to be reached by the Act. I was just going to say, but you're actually correct, Your Honor, that the district court itself made a finding, although it didn't make findings with respect to neutrality. If you look at footnote 19 of the district court's opinion, it said voter guides are typically intended to influence voters, and indeed we submitted a declaration below from a retired state senator supporting that conclusion, both in general with respect to voter guides and with respect to this particular voter guide, which of course is the only communication in front of the court on this appeal of an as-applied challenge. This particular voter guide says that in its preamble, right? Yes, exactly. It says it's designed to help voters, quote, choose candidates. Is it possible, and that kind of goes to my question, is it possible to make that distinction between, in this context, between communications intended to impact the outcome of an election and communications that are just purely educational? Because somehow, unless your communication has got to be infinitely, it can't be infinitely broad. Somehow you've got to limit it just by practicality. So you have to decide, what am I going to educate voters about? And my guess is you're not going to educate voters about the growth ring proliferation in Redwoods unless you happen to be in an area where the climatology or something relating to Redwoods is important. And so if you pick that issue to educate voters, it seems to me you're trying right there to have some impact on the election. The scenario I was using before with the law clerk was last night for some reason I thought I'd look into polar bear hunting. I was wondering whether or not any organizations would be interested in the attempt to ban polar bear hunting. And that's not something which is going to be in the voter guide, again, unless you might be interested in the ecology of polar bears. But it seems to me, and maybe I should address this to your opponent, the very fact that you determine what issues you're going to educate voters about puts the rabbit in the hat. From that point on, it's hard to say, well, if you don't care about how voters respond, we simply want to, quote, educate, quote, unquote, voters because you're selecting the issues that you want to educate them about. I don't know how to make a distinction between those publications which are designed to impact the election and those which are just purely academic interest. I absolutely agree with you, Your Honor, and I think the fact that the district court in this case was unable, apparently, to ultimately apply its own test shows how difficult or perhaps impossible it can be to draw that line. I think that's why the Supreme Court has repeatedly endorsed the electioneering communication definition in the federal statute, which is essentially the one that was borrowed by the Delaware legislature, which it described as easily understood and objectively determinable because it does not get into the impossible world of line drawing that you've described. It clearly defines in easily understood terms a relevant universe of communications. What is the level of scrutiny we should give to the dollar threshold in the Disclosure Act? Well, although we indicated in general, Your Honor, the standard here is exacting scrutiny, the Supreme Court has indicated that with respect to dollar thresholds in particular where legislators will have particular knowledge about the realities of politics and what you can buy, the standard is even more deferential. That is, unless the monetary threshold chosen is wholly without rationality, the court should accept it. In this case, we actually put in evidence that supported the absolute reasonableness of the triggers here, but in any event, the standard is a very deferential one. And I assume there was evidence of this. You can actually reach every single voter in Delaware with $150 ahead? Is that possible? It wasn't in Delaware, Your Honor. I believe that was in a Delaware house district. Oh, okay. It was within one particular house district. But again, Delaware is a very small state. At the last census, it had fewer than a million population. I'm curious about the discovery that you were seeking below, because the district court here made some holdings as to the constitutionality of the act and granted a preliminary injunction, and I gather denied any discovery. You had made some certain requests. In Wisconsin Right to Life, the court recognized that under the BCRA, albeit they're dealing with the expenditure limits, that some minimal amount of discovery may be appropriate, but that it was minimal, if any. What discovery here do you contend is warranted, and do you believe that discovery is necessary before the district court can make a ruling on an as-applied basis? Thank you, Your Honor. Below, the discovery we initially sought, and we tried to bear in mind the lesson from Wisconsin Right to Life about being restrained in discovery in these circumstances where First Amendment rights are at stake, went directly to challenging or testing the veracity of particular allegations in plaintiff's complaint, and particularly among the core allegations there initially were ones about the chilling or burdening effect of the law on DSF and its members, and what evidence DSF had in that regard. It was only in response to those discovery requests that DSF first disclaimed affirmatively any reliance on the argument about its members facing threats, harassment, or reprisal, which you may recall is the test that the Supreme Court has said is the one that in as-applied challenges needs to be satisfied for a group to show that the burden on it and its members is so great that the law might not be applied. So that was really the focus of that discovery. So what's your understanding of what's left for a ruling on an as-applied basis if that in fact is conceded? I think that there is nothing necessary at this point for the resolution of an as-applied challenge. Of course what would be relevant would be determined by the legal standard that governs the challenge. The District Court set out its own test which had to do with neutrality, and it was because of that and because of the District Court's acknowledgement in its opinion that the potential factual bases for applying that test were not clear that there was discussion of further discovery. We think that's not the correct test. We think that under the correct test, the record is absolutely sufficient to render a decision that the Disclosure Act may be applied to the communication at hand. If the panel has no other questions, I'd reserve the balance of my time. Okay, thank you. Good afternoon, Your Honors. May it please the Court. Alan Dickerson of the Center for Competitive Politics. Let me ask you the same question. Well, you would not have any problem because right now there's an injunction in place, so the last thing you want out of us is speed in this case, so to speak.  we're in the middle of a process of we'd actually met and conferred with the Posting Council about attempting to expedite this appeal, and that fell through, I think, just as a matter of the difficulties of litigation scheduling. I do think that it would be good to have clarification from the Third Circuit, given that my client would like to do similar activity in the future. But yes, for purposes of this election year, they're protected by the injunction. Okay, thank you. Certainly. Help me understand how, I'll assure you, I had a hard time trying to understand exactly what Ted Robinson was doing, but I do finally, I get it, and I think it is consistent with your argument relying upon your 501c3 status and basically saying that where you are a, and you don't use the term educator, but basically a neutral educator or a neutral purveyor of information, kinds of concerns that arise in the other context where you're concerned about the corrupting influence of soft money and hard money just aren't there because you're not an issue advocacy or candidate advocacy group per se. I think that's basically the foundation of your argument. It's clearly the foundation of what Judge Robinson was trying to do in joining the enforcement of this Act. But help me insofar as I pose that question to Mr. Cedarbaum, how is that possible? If I put out a voter guide, I've got to decide what I'm putting into that voter guide. It's got to be limited somehow to a size that the average voter would read it, so maybe it would get past a three by five card, but not much past that. And when I start limiting down the issues I'm going to educate them on, I'm making a decision to only convey information about a particular issue. And if I'm only informing voters about a particular issue, it's clear to me I'm trying to reach voters that are concerned about this issue. To me, that's something more than just academic interest and education that you're trying to have  I think there's a specific response and a general response to that. The specific response is that, and this goes to the general vagueness concerns the state has raised throughout its briefing, the IRS hasn't had any trouble for decades determining whether a voter guide is appropriate for organizations barred by federal law from intervening in campaigns. There are objective, there's a nationwide experience, there's objective rules. Yeah, the difference there is the IRS, they are looking at it from kind of the, use the term electioneering, they're looking at it through the lens of electioneering. The state's interest here is very different. They simply want disclosure. And it seems to me to the extent they want disclosure their interest is only served if the disclosure is effective to convey the information that they're concerned about letting voters know about. And if I'm a group, and let's take polar bear poaching because it does not impact anything in this case, and let's assume I'm in the coast regions of California, I don't know the regions of California. Seals are probably a better example, I don't think. I don't think there are a lot of polar bears in Redding. The polar bears have come down to California. And I only educate people about the candidates and on seals and sea lions. Aren't I specifically hoping that I'm going to reach an audience where if a candidate has a my views about what is best for ensuring the longevity of the sea walrus, that I'm going to be able to influence voters not vote for that person simply by the mere fact of educating them. And I think that's in many ways the general question. That's what's in the background of all of this. Is that when Buckley was decided, procurium decisions of the Supreme Court, every single campaign finance case refers to a reference. That case stands for the proposition that there's some element of civil society, which a law that impacts and requires disclosure for that is over broad. It violates the privacy association and belief. You're getting more into a First Amendment kind of least restrictive analysis, which isn't really there for exacting scrutiny. I could not agree more, Your Honor. Exacting scrutiny very explicitly comes out of the NAACP versus Alabama line of cases. It was incorporated by Buckley. The idea of exacting scrutiny is that there has to be a fit between the disclosure required and the state's. Right, but the fit does not have to be so exact that it becomes consistent with the least restrictive alternative. I agree that it is not strict scrutiny. I think a lot of the difficulty is that because the state's position is that you can label any amount of disclosure, disclosure, and you can trigger that with anything related to an election. Well, that's true, but when you say anything disclosure, disclosure has to be, I don't want to use the term fit because it sounds like a drubber analysis, but the disclosure has to be sufficiently tied to, related to, and sufficiently enhanced the state's interest to get by the second prong of exacting scrutiny. If the state's interest, and Delaware is arguing that the disclosure here in terms of time and dollar amount is as broad as it is because of the nature of the jurisdiction that we're dealing with, why isn't that incorrect? I mean, we're not talking $50,000, we're talking, I guess, about $500, and their argument is, what I talked to Mr. Sidemo about, if $150 can reach every single voter in a house district in Delaware, that wouldn't even reach a large high-rise building in Manhattan, I don't think, because nobody, well. Well, they manage with menus, Your Honor. I'm sorry. They manage with menus, but no, it's menus that are not included in the Act. No, I do want to answer your question, and I think it comes back to this idea of the interest. You know, there's an agreement there has to be some level of tailoring. What's the interest? The interest is in the supporters and constituency of candidates. I mean, that's the interest that Buckley articulated. It's very clear on this. Buckley was focused more on expenditures and campaign spending, which is a different kind of interest than disclosure. Certainly, but it was concentrated on it because those were the definitional triggers for PAC status. And once you were a PAC, you had to bring in your donors, you had to do all sorts of things. Right, and there were problems with that that Buckley tried to fix. Yes. And that got us here today. And when you have the PAC status, those are the Eighth Circuit, the Tenth Circuit, those are the cases, the only cases, where this kind of disclosure requirement has been struck down. But if you have a disclosure requirement that does not bleed into the PAC requirement and the burdensome kind of registration that comes with PAC standards that you had in the Eighth and the Tenth Circuit, every other case of this kind of issue has said that the disclosure provisions of state law are okay. And given that, just the numerical equation, how do you get to the likelihood of success of what we have to focus on in an injunction? There's a lot packed in there, Your Honor. Well, just the last part is what I'm trying to get to. All right. On the last part. Focus on the last part. Partially, it's because this is an as-applied challenge. And because the McConnell Court said this, I think, very quickly, very well in saying that courts do not resolve unspecified as-applied challenges. Take Tennant. Tennant, the case out of the Fourth Circuit, which was the case relied upon. At oral argument in district court, counsel for DSF said, this level of invasive disclosure for this type of trigger has never been upheld by a court. And additional briefing was offered on this, and the case that the state relied upon was Tennant. Under Tennant, under West Virginia law, we wouldn't be regulated because there are specific exemptions for voter guides. And in fact, there was a broad exemption for voter guides that got at exactly what Your Honor is asking. How can we tell how neutral this voter guide is? Go ahead. The voter guide here, here's the help that I need. The district court describes advocacy and I think it was footnote 19, and what I'm not understanding is, how is it that the voter guide doesn't fall smack within that definition? To the extent that a voter guide is considered advocacy in the line of Buckley, I would disagree with that statement. Because, and this, I think, is the macro point that I'm trying to respond to, is that anything impacts an election, any sort of advocacy, any discussion of issues is going to have an impact on how people vote. That's exactly right. That's right. And Buckley said, these things will collapse in application, and that's not good enough. And NAACP said, you have to have a range, you have to have a role for privacy of association and belief. And that the giving of money can I don't see that. I see it from NAACP versus Alabama. I don't see that here at all. Well, Buckley disagrees. Disclosing people who contribute to an organization would submit them to the kind of bodily harm or potential for threatened bodily harm that supporters of NAACP were subjected to in Alabama. This is not the same situation. Have you conceded that? I'm sorry? Have you conceded that that's not something you're relying on? We have conceded that we are not relying upon threats of harassment or reprisal. But the privacy of belief and association comes out of the NAACP case as specifically adopted by Buckley. I can read this into the record. Well, the privacy may be there, but that is part of the equation, it seems to me, in terms of whether or not the state's interest is sufficient to impose some kind of restriction or regulation or breach, if you will, on the right of privacy. And that's where I go back to the mathematical equation. I think it's like seven or six circuits that have looked at this have all upheld these disclosure requirements, even given the fact that the disclosure requirement is going to impact association. You're dead right about that. I don't think that Mr. Sitterbaum would disagree with that. It's going to have some impact on it. I think the issue we have to deal with is is it going to be the kind of impact which is so egregious that that impact on association overrides what would otherwise be the state's ability to disclose, to satisfy its interest, to educate the public, to gather data, to enforce election laws. And courts have not said that's the case, unless you mean the kind of PAC regulation, again, the eight and ten circuits. Well, that's much of what we've said, is that what is the functional difference on associational liberties between what Delaware is asking for and a PAC requirement? We actually provided a chart in our brief where we laid out, these are really similar to PAC burdens. The statute provides for what disclosures PACs have to make in Section 8030, right? And they're much more onerous, and they're very different than the disclosure provisions for third-party advertisers in Section 8013, which we're dealing with here. I think we just disagree on that factor, Honor. Well, I'm going to be very sorry. Well, that's the mathematical point, Honor. I'm not good at math, but I think one-half of three is probably two is more than that. But let me put the point slightly differently. Since we do know, and since everyone concedes that exacting scrutiny is a heightened form of constitutional scrutiny, and because we concede I think we're all agreeing, that the reason we're applying that heightened scrutiny is because of these burdens on association and the right to associate in private, the question becomes the question becomes exactly how close the fit is. And I think in some ways the state gave away the candle when they said, well, you know, we should be able to look back four years because, you know, the contributor knows what they're giving to. The money is fungible. It won't come as a surprise that, you know, what particular position you're taking. Well, that's the case. Is that the critical impediment to the act passing constitutional muster? The critical impediment is the general lack of a fit. I think it's a very bad fact for the state in the sense that in what conceivable universe is $100 given three-and-a-half years ago connectable to an organization's speech three-and-a-half years later? I mean, that's simply too far afield. Did you raise that argument below? We cited the statute. I would have expected the state was aware of its own terms. Did you make the argument below that the length of the disclosure period made it unconstitutional? I don't know with what specificity, and I don't want to misrepresent it, but if you look at I think it's paragraphs 34 and 35 of our complaint, we do point out that it's a variable length. Why isn't the outcome of this case simply determined by Citizens United? Because Citizens United is not a donor disclosure statute. The Bipartisan Campaign Reform Act has originally passed banned corporations, including non-profit corporations, from making this type of speech at all. Any corporation of any type or union was not allowed to make a communication mentioning a candidate within a certain period unless they did it out of a separate, segregated fund, out of a PAC. But it addressed advertisements. It addressed issue advocacy. And it, in pretty broad terms, authorized regulation requiring disclosure as to issue advocacy. And it's a difficult opinion, in frankness, Your Honor. I don't think it's a model of clarity, especially on the question of whether it addressed issue advocacy. How is that? I mean, you cite, you're suggesting that Section 4B of Citizens United was dicta, but you cite the Seventh Circuit case on that. Where in Citizens United itself do you find language suggesting that Section 2B dealt with advertisements? Because I don't see any referenced advertisements in there. And if it's not, then when we deal with Section 4, that's a holding. That's not dictum. Whether it's dictum or not, it was based upon a distinct type of communication. When Buckley was laying aside and preventing state regulation of, I mean, an actual example in the circuit court decided, to my knowledge, unanimously, was, you know, the ACLU taking positions on the civil rights voting records of candidates. When Citizens United, Citizens United's theory, Citizens United, the organization's theory, was we shouldn't be allowed to do any of this. We shouldn't have to put our name on this. We shouldn't have to tell you anything about our internal workings. It was a full attempt to say our speech simply shouldn't be covered. And that's not what's going on here. What's going on here is that PAC requires you to be, and I see my time's expiring. What's happening here is that the state is labeling all internal information about an organization that spends $500 and mentions a candidate as something that the public has a right to know. And that's simply substantially broader on the facts than either what Bicker requires, especially with the regulations that were in place when that case was decided, or any other case that has been heard by this court. It's saying that as to a voter guide that says in its preamble, this voter scorecard will help you choose candidates who best represent your values. Isn't that in the heart of election-related materials? I think that's a very narrow understanding of what election-related means. When you see election-related... Well, help me with that one. Sure. I'm happy to. Because I think, again, that this is something where it's just sort of been lost in very difficult cases. Buckley, when it talks about the informational interest, talks about we need to know who stands behind these particular candidates. And it required a pretty close fit between what it means to stand behind a candidate and what gets disclosed. And that is sort of been lost, I think, in a lot of cases. How does a voter guide, no matter how tight that fit is, why doesn't this voter guide squeeze right in there, in terms of its fit? If the state statute said, you know, you can only do a voter guide if it's very, very careful. First of all, it fits through the see-through requirement from the IRS, which I would think would be relevant. There's been a policy decision made about who will not be taxed. That's a different interest from whether or not the public has an interest and whether or not the government has an interest in electoral transparency. How about not fitting? That just doesn't fit. And honestly, Your Honor, I think you made the point perfectly when you said, you know, if we can regulate these sort of voter guides, why can't we regulate speech about seals in Northern California before an election? Well, you can't. You can't. If somebody's running saying, I think there should be many seals. I'm not talking about taking my yacht in the harbor and moneying one of these bloody seals. I think we should have open season on the seals. I should be able to have a voter guide that says, don't vote for this guy because he's going to throw all the seals away. Well, I think if your voter guide said, don't vote for this guy, it would be a different voter guide. So a voter guide that was a one-issue voter guide, like pick the issue, abortion. Family values. Family values, abortion. Something at random. Whatever, right? You have a list of candidates and either a check or an X. You know, yes, they are or no, they're not. That wouldn't fall within what the question just articulated? And this gets technical. I mean, it's – Well, yeah, that's what we do. You know, there's a theory the First Amendment requires the state to steer. Oh, I can't even imagine. You know, there's a theory the state has to steer wide clear of these things, precisely for this reason. But the reason the court has denied intense and effects tests, the reason that discovery was not allowed below, the reason why we don't get into these deeply, deeply technical questions, is that they're going to depend on the eye of the beholder. You know, something that is intended in every way to be neutral and to give information that's educational will be read by people who disagree with that position differently. That is just a fact of human nature. So your point is any kind of voter guide should be protected and not fall within the ambit of the act, as long as the intent of the organization is stated to be education. That was the view of the district court and tenant, and that was not appealed by West Virginia. West Virginia now has experience of exactly this. Voter guides are excluded. In order to affirm the district court, do we have to adopt a neutral communication doctrine? I don't believe so. I think it's enough to say that this is a unique statute in the experience of the federal courts, that it goes too far both in the scope of what it asks for and the scope of what triggers it, that it's very easy to trick over this line, and that consequently as applied to this communication under these circumstances, the court was correct. How is the neutrality articulated by the district court workable as a standard? Or as you've even asked us to look at it, when an organization is putting out neutral material to educate, how could that be administered by the court? I mean, isn't even the way you frame an issue, whether something is viewed by some as an estate tax and some as a death tax or some as a minimum wage and others as a living wage, just the way the issue is framed can incorporate advocacy. So doesn't that analysis that the district court used and that in essence you're asking us to adopt put courts in the position of having to scrutinize and make determinations about where it crosses the line from education to advocacy? That doesn't provide the kind of bright lines and guidance that we tend to look for to try to encourage and promote speech and association. Well, and I'm certainly sympathetic to the line drawing problem. It's one of the reasons the court has generally been hesitant about having regulation in this area. But I don't think you cure the over-breath problem of, you know, basically converting any group that mentions a candidate and spends $500 into a PAC. Well, over-breath is a facial challenge, and we're here dealing with an as-applied challenge. So can you take this back to Delaware Strong Valleys and the voter guide that we have to deal with? How is it that that falls within gray area? Well, first of all, it falls within gray area because federal law says you can give money to an organization, you will get a tax deduction for it, it will be protected from disclosure by federal law, and they can make this communication. The Fourth Circuit rejected the idea of an exemption, you know, based on tax status. And even the FEC, it retracted its own regulations. Although that was under administrative law theory, just for the record. But it did so, and the analysis has been that trying to make the exemption for tax purposes a proxy for an exemption for campaign finance was deferring campaign finance regulation to the IRS, which was not appropriate. And so they, on that ground, retracted their regulations. Why would we, if we have Citizens United saying that there's not a distinction between express advocacy and issue advocacy when it comes to disclosure obligations, why would we say that there is such a distinction based on the tax exempt status of the particular speaker? I think this is a lot of why the Court's opinion below emphasizes the donor disclosure element. That is a line that can be drawn. And the fact is that when Citizens United talks about disclosure, it's not talking about the disclosure of Citizens United's donors. That was under existing federal rules at the time that case was brought off the table. And it was off the table precisely because when Buckley talks about contributions and that connection between you need to know who's funding this so you know who stands behind this person, they were talking about PACs. They were talking about organizations whose principal purpose was the election or defeat of clearly identified candidates. That's not what's going on here. You're backing the electioneering communication again. It seems to me all the complexity you've mentioned and the difficulty about determining whether or not something is an electioneering communication or purely educational communication can be readily solved by simply picking the proxy of time and proximity. It seems to me that's what Delaware's done here. Rather than trying to say, well, wait a minute, if somebody gives $100 to candidate X versus $100 to organization X, it may or may not be the same thing. But if it bears some relationship to an election or a campaign, it's safe to assume that the purpose of that donation is to either advance a candidate or to advance issues that that candidate either stands for or against. Now, I guess you'd assume that what's wrong with that in the Delaware statute is that the time span, the proxies rule. But given the amount of deference we have to apply to them, why would we be in a position to say you picked the wrong proxy? What you're trying to measure is dead on. It's accurate, although you may not concede that. The accuracy of your measure is there, but your period is too long. It's so long that it's not a valid proxy anymore. You've got to tighten it down. Well, maybe I should stop there because I'm throwing more at you. No, no, no. I mean, to the extent Your Honor is talking about, let's imagine a hypothetical statute, which says that if you give money, well, I mean, this is not a hypothetical statute. This is a federal statute. What if you were to say that if you coordinate the meaning of it, if you give for the purpose of a particular communication or you give for the purpose of this type of communication, that you just get disclosed? In the same way that if I give money to, I actually don't know who's running for office in Delaware right now, but if someone were to say something about the fact that it's a campaign, I'll say something about the fact that it's election law. No, but honestly, Your Honor, if I were to give to a committee to elect Smith, and I think in some ways this is what the state was saying, that you know you're giving for purposes of electing Smith. It makes sense under Buckley to tie my name to Congressman Smith. This is just too attenuated, not just in the sense of, you know, what's the intention of this organization, which I don't believe is the purpose. My hypothetical, which you say should be clumped into all voter guides, it's not attenuated, right? Because my hypothetical was a one-issue voter guide so that you know everyone in the state is either for or against a particular proposition. You're advocating soft money. Your argument is the exact argument that Brick was trying to lay to rest, and that is you're arguing for a scheme, I don't mean scheme pejoratively here, but a statutory construct, if you will, under which hard money can be disclosed and regulated. Forget regulated because then you get into independent expenditures. Hard money can be disclosed. Soft money can't be disclosed. Isn't that what we were how many years ago before? No, because soft money was given to political parties. I mean, again, that's also the problem with threats, harassment, and arousal theory. Both of those are exceptions to you're already a political committee. Your major purpose is elections. This isn't the major purpose of Delaware Strong Families. Well, should Delaware or any state be able to have the same kind of concerns of disclosure of voter education, transparency, that situation where an organization's purpose is not necessarily to elect person A, but to advance at all costs organization B or C? Isn't to the individual voter and to the governmental purpose, isn't it the same that government's interest is not necessarily who gets elected, but what that person stands for? And to that extent, I'm not sure that the distinction you're drawing is very valid. If a candidate's ex is running for an office, random, whatever it is, a municipality or state or nationally, and he or she belongs to an organization very prominently aligned with certain causes and values, the NRA immediately comes to mind. Everybody would know how effective the NRA is at promoting its values and lobbying. Shouldn't the public know if someone contributes to an organization which may or may not be very inconsistent with the individual values of that voter, even though the contributor is not contributing money to the candidate that the NRA or any other organization, I don't mean to single the NRA out, is supporting? Well, let's use the Sierra Club and the NRA just to cover some range. I mean, in a sense, yes, but also, I mean, again, the use of that sort of organization, I think, cuts the other way. I mean, to the extent the court, and I think that Delaware reads far too much into what was actually happening in these cases, but to the extent that the court has said, we need to know who stands behind as a proxy, we need to know who the funders are as a proxy for what the organization stands for. You clearly don't need that for the NRA. You don't get to do it backwards. The organization is so famous or infamous that we need to know who all its donors are. That is NAACP. That's an organization where everyone knows what they stand for, and we want your membership list to go through them. Or Talley v. California, or a number of other, you know, very longstanding cases about the fact that there is such a thing as privacy in civil society. I mean, I think that what's different about this case is that Delaware's theory is so broad that it would justify the complete destruction of a right to privacy in one's associations, merely because you do something that might have a political impact. And that's just too far afield. Delaware's Family Policy Council is involved with elections. Yes. Right? No, I don't represent them. They put out a voter scorecard. And you don't dispute that that voter scorecard has an important informational interest to the public in terms of its disclosure obligations on contributions to the organization? I do not. And I would point your honor to the Massachusetts Citizens for Life case, which I think helps explain this distinction. So then help us understand, how is it that that voter scorecard, when you remove the color coding and you remove the grades, so that it is then the voter guide, how it loses that important informational interest? Well, because I think you have to take seriously the idea of the voter as a sovereign entity, as someone who has his or her own things going on in his or her own head. When you get information, and I think this again goes to the broader point about the seals, either the military unit or the animal, depending on the voter, where you've got this issue of, I just learned that this person likes fluffy animals or hunting with high caliber rifles or what have you. How that will be interpreted by the voter will depend on the internal workings and beliefs and views of that voter. And I think that's different from saying this person gets an F. Or this person gets color-coded red. Although even that, depending on the facts, could also have. I mean, I think the problem is that you're taking the agency away from the voter. You know, the information and how it's used, that's a fundamental part of the sovereignty and agency of a free citizen. And I think that that needs to be given a fairly significant amount of deference. And in some ways, that's what's behind a lot of this, is that to the extent we accept that they're two sides of the same coin, on one hand, you want to have a situation where this speech gets done. And if it's not getting done because people want to keep their associations private, that's information that's not going to the mind of the person with his or her own beliefs. And too much of the work is happening inside the head of the voter to attribute all of that to the original speech. And I think this is, again, I think you overturn Buckley if you say that that isn't true. And I think a lot of the problem is that, you know, you have these very difficult cases that are lengthy, that are complicated. They need to be read in harmony with each other because none of them have ever been overturned except for portions of McConnell. And the fundamental principle that there is civil society that does talk about issues, that that talking about issues might impact elections, but that you nonetheless must limit your statutes on over breadth grounds from reaching those groups. That's a core holding of Buckley. Okay. So you can read this one for a while. Mr. Siedbaum, you deserve some time. Thank you very much. Maybe during your response to Siedbaum you could respond to what Mr. Dickerson said about the privacy of association. And I know that's been addressed in McConnell, was in Citizens United too, but to the extent that the time period is so broad that it encompasses any kind of contribution, I'm not saying that's what we have here, but it seems to come very, very close. If you justify that in terms of, well, that's a proxy to get around the problems with electioneering language, we can't look at a statute in terms of electioneering communication. Buckley has taught us that. It's too vague and impossible. But what we can do is develop a proxy for that based upon proximity to election. That seems to me to be a very valid legislative approach. But on the other hand, Mr. Dickerson is saying, well, when you do that, when you make the proxy so broad, you then begin to impact on the individual citizen's privacy of association. What if I don't want anybody to know that I like warm, fuzzy animals or that I have a disability against seals or porpoises? I want them to be obliterated. Why shouldn't I be able to contribute to an organization whose purpose is to obliterate the walrus without disclosing to my neighbors that I don't like walruses or walruses? Sure. Let me try to respond to that. I think you're absolutely right that all the courts that have looked at these issues from Buckley on have recognized that disclosure laws, like the federal law and like Delaware's law, may have some impact on people's associational rights. The disclosure of people's private associations may have some deterrent effect there. The courts have not been blind to that. Indeed, Buckley itself acknowledged that public disclosure, quote, may deter some individuals who otherwise might contribute. Nonetheless, recognizing that there might be some impact on the associational interest, the Supreme Court in Buckley adopted the threats, reprisals, and harassment test as the standard by which we should judge whether that impact on the associational interest is great enough that it can outweigh the important First Amendment interests that are advanced by disclosure laws. And I would refer this Court to the Third Circuit's own en banc decision in the Mariani case, which was a 2000 case after Buckley but before McConnell and Citizens United. In Mariani, at page 775, this Court said, Buckley carefully considered the danger posed by compelled disclosure. It held that the state interests promoted by the FECA's reporting and disclosure requirements justified the indirect burden imposed on First Amendment interests and that compelled disclosure requirements were constitutional in the absence of a reasonable probability that disclosures would subject their contributors to threats, harassment, or reprisal. That is the test. So there is, I think, absolutely a recognition here that there will be some impact on the associational right, but that there are very, very important interests on the other side and that, therefore, the impact has to reach a substantial level under the threats, harassment, and reprisal test. If the Court doesn't have any other questions, I would waive the remainder of my time. Thank you. Very interesting. If folks don't usually come to see what we do, you'll think that this is all we do is engage in interesting cases. That is just not the situation. You happen to have come here on a day when we had two very interesting cases. We'll make up for that to some extent tomorrow. Thank you, Your Honor. An excellent advocacy, too. Thank you. Yeah, I just want to welcome you. I guess you don't journey down to the confines of the Third Circuit all that often because you're too caught up in the gist of the Second Circuit involving what we do. But welcome. Hopefully, we have not said anything.